**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

TEXOS S.R.L., Plaintiff

v.

PETRÓLEOS PARAGUAYOS (PETROPAR), Defendant

Civil Action No. 1:26-cv-09569

# COMPLAINT

## I. PRELIMINARY STATEMENT

1. TEXOS S.R.L ("TEXOS") hereby seeks damages for PETRÓLEOS PARAGUAYOS (PETROPAR) ("PETROPAR")'s nonperformance of a judicially approved settlement agreement. TEXOS is entitled under Paraguayan law to compensation for the resulting loss of its settlement bargain. TEXOS is an Argentine company specialising in the trading of agricultural and oil related products. PETROPAR, on its part, is a Paraguayan State-owned petroleum company, and an agency of the Paraguayan government under the Foreign Sovereign Immunities Act ("FSIA").

2. The present dispute resulted from PETROPAR awarding a diesel-supply tender worth USD 69,802,000 to TEXOS in 2009. The award was later revoked by PETROPAR. In 2011, TEXOS filed a lawsuit in Paraguay seeking over USD 31 million. The claim included bid costs, losses from third parties, lost profits and lost business opportunities.

3. The parties went through years of litigation. In such context, the Attorney General of Paraguay considered that PETROPAR was likely to lose at least three damage

categories.[1] As a result, the parties executed a settlement agreement in Paraguay on December 2, 2020 (the "Settlement Agreement" or "Agreement"). Sergio Marsiletti signed on TEXOS's behalf. Denis Lichi, then president of PETROPAR, and Sergio A. Coscia Nogués, then Attorney General, also signed. PETROPAR thus committed to paying USD 6,898,750, free of taxes, fees, and duties. In return, TEXOS was to drop its claims. The agreement was later confirmed by a Paraguayan court. Copies of the Settlement Agreement and the order approving it, together with their English translations, are attached as Exhibit 1.[2]

4. The Agreement contemplated payment preferably during fiscal year 2020, subject to budget availability. If payment was not completed during that period, Clause VI provided for an additional performance period through the first quarter of 2021.[3] Clause IV provided that USD 4,001,275 would be transferred to the Citibank, N.A. account designated by TEXOS in New York to receive payment on its behalf (the "Designated Account").[4] PETROPAR made no payment whatsoever.

5. On December 23, 2020 (i.e., 21 days after the Agreement was signed, and before the extended period for payment began), Mr. Coscia Nogués and PETROPAR legal director, Mr. Alberto Mendoza, requested that the Paraguayan court handling the underlying case (the "Court of First Instance") leave the agreement without effect. They alleged

---

[1] PETROPAR, *Descargo institucional de Petróleos Paraguayos (PETROPAR) ante la solicitud de informes de la Comisión Permanente del Congreso Nacional* [PETROPAR's Institutional Response to the Request for Information from the Permanent Committee of the National Congress], annex to Nota PR/DL No. 025/2021 [Official Letter], Jan. 12, 2021, at 8 (reporting the assessment communicated by the Procuraduría General de la República [Office of the Attorney General] in Nota PGR No. 660/20, Nov. 18, 2020; translation from Spanish).

[2] Settlement Agreement, Ex. 1 at 9–14; A.I. [Interlocutory Order] No. 2311, Juzgado de Primera Instancia en lo Civil y Comercial del Undécimo Turno de la Capital [Court of First Instance in Civil and Commercial Matters, Eleventh Division, Asunción], Dec. 10, 2020, Ex. 1 at 19 (Para.).

[3] Ex. 1, cl. VI.

[4] Ex. 1, cl. IV.

PETROPAR's inability to pay. The court granted the request in Interlocutory Order No. 2, issued on January 6, 2021 (the "January 6 Order"),[5] and the underlying proceedings resumed. On July 1, 2022, the Court of Appeals affirmed, finding that the Agreement had not been performed and expressly characterizing Clause VI as a *pacto comisorio expreso*: a contractual provision for termination upon nonperformance under Article 726 of the Paraguayan Civil Code.[6] The Supreme Court's Constitutional Chamber rejected TEXOS's constitutional challenge *in limine* on September 10, 2025.[7] The termination ruling is now final.

6. This action proceeds from that final termination and the Court of Appeals' express characterization of its contractual basis. TEXOS seeks USD 6,898,750 in damages under Paraguayan law for PETROPAR's nonperformance and the resulting loss of its settlement bargain, together with interest, costs, and other appropriate relief. It does not seek reinstatement of the Agreement, reversal of the Paraguayan rulings, or adjudication of the underlying procurement dispute.

**II. THE PARTIES**

7. TEXOS is a limited liability company organized and registered under Argentine law. Its main office is located in Buenos Aires. TEXOS trades agricultural and oil-related products to companies in both Argentina and abroad.

---

[5] A.I. No. 2, Juzgado de Primera Instancia en lo Civil y Comercial del Undécimo Turno de la Capital, Jan. 6, 2021, at 1, 5 (Para.).

[6] A.I. No. 506, Tribunal de Apelación en lo Civil y Comercial, Segunda Sala de la Capital [Court of Appeals in Civil and Commercial Matters, Second Chamber, Asunción], July 1, 2022, at 4 (Para.) (the "July 1 Appellate Order").

[7] A.I. No. 1445, Corte Suprema de Justicia, Sala Constitucional [Supreme Court of Justice, Constitutional Chamber], Sept. 10, 2025, at 1–2 (Para.) (the "September 10 Order").

8. PETROPAR is a public entity from Paraguay. Its Organic Law states it is an autarchic entity, decentralized from the central government, and that it has separate legal personality and patrimony.[8] Accordingly, it may be sued, conduct commercial operations, and maintain relations with both public and private entities.[9] Paraguay has been the owner of all ownership interests in PETROPAR since 1985.[10] PETROPAR thus satisfies the FSIA's ownership requirement at the time of filing. Its status rests on the Paraguayan State's direct ownership, and not merely on governmental control or indirect ownership. *Dole Food Co. v. Patrickson,* 538 U.S. 468, 473–80 (2003).

9. Pursuant to 28 U.S.C. § 1603(b), agencies or instrumentalities of the State must be separate legal persons; an organ of, or majority owned by, a foreign State or its political subdivision; and neither a citizen of a United States state nor created under a third country's law. PETROPAR satisfies all such requirements, and thus falls within the definition of a foreign State for FSIA jurisdiction and immunity purposes.

## III. SUBJECT-MATTER JURISDICTION, SOVEREIGN IMMUNITY, AND PERSONAL JURISDICTION

10. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1330(a) and 1602–1611. Section 1330(a) grants jurisdiction over non-jury civil claims against foreign States that do not enjoy immunity.[11] The FSIA provides the sole basis for jurisdiction over foreign States, and removes immunity privileges when statutory exceptions apply. 28 U.S.C. § 1604; *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443 (1989);

---

[8] Ley No. 1182/1985, Que crea Petróleos Paraguayos (PETROPAR) y establece su Carta Orgánica [Law Establishing PETROPAR and Its Organic Charter], art. 1 (Para.) (the "PETROPAR Organic Law").

[9] PETROPAR Organic Law arts. 1–4.

[10] PETROPAR, Reseña Histórica [Historical Overview] (last visited Nov. 2, 2026); PETROPAR, Nota PR/EJ No. 413/25, Dec. 18, 2025, at 1 (Para.).

[11] 28 U.S.C. § 1330(a).

*Rogers v. Petróleo Brasileiro, S.A.*, 673 F.3d 131, 136 (2d Cir. 2012). In the present case, PETROPAR does not enjoy immunity due to the commercial activity exception.

**A. PETROPAR Is an Agency or Instrumentality of Paraguay**

11. PETROPAR satisfies all requirements in § 1603(b). It has separate legal personality and patrimony, and can undertake obligations, conduct commercial relations and participate in court.[12] Paraguay is its sole direct owner, thus satisfying § 1603(b)(2) and *Dole Food,* 538 U.S. at 473–78. PETROPAR was created under Paraguayan law exclusively, and is not a citizen of any United States state.[13] It is thus a foreign State under § 1603(a).

**B. The Commercial Activity Exception Applies**

12. Section 1605(a)(2) contains an exception based on commercial activity in the US, acts in the US that are connected with commercial activity abroad, or acts abroad that are connected with foreign commercial activity with a "direct effect" in the US. This last, third clause, is fully applicable to the present case.

13. TEXOS's claims are "based upon" PETROPAR's undertaking and nonperformance of the Settlement Agreement's consideration. Such conduct provides the basis for relief. *See Saudi Arabia v. Nelson,* 507 U.S. 349, 356–58 (1993). The present claim is thus based on the Agreement as a commercial transaction, not on the earlier tender or litigation.

14. The commercial character of the activity is determined by its nature, not its sovereign purpose (if any). 28 U.S.C. § 1603(d). Sovereigns act commercially when they act "in the manner of a private player". *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614 (1992). This includes settling commercial litigation. *Fontana v. Republic of Argentina*,

[12] PETROPAR Organic Law art. 1.
[13] PETROPAR Organic Law arts. 1–4.

962 F.3d 667, 673 (2d Cir. 2020). PETROPAR acted as a private player when negotiating the Agreement, promising a fixed payment, designating payment accounts and failing to pay. PETROPAR's State ownership does not change the commercial character of the activity.

**C. The Claim Satisfies the Third Clause of Section 1605(a)(2)**

15. The third clause of Section 1605(a)(2) requires, cumulatively: an act outside the US, a connection to the foreign State's commercial activity abroad, and a direct effect in the US. All such requirements were met. The Agreement was executed in Paraguay to settle a Paraguayan litigation, and PETROPAR breached and sought termination abroad. These acts, which occurred abroad, produced domestic consequences, as explained herein.

16. The pertinent foreign commercial activity was PETROPAR's commercial settlement of the litigation in exchange for USD 6,898,750. The Agreement thus created the payment obligation whose nonperformance gave rise to this claim. PETROPAR's noncompliance was directly "in connection with" its commercial activity, pursuant to § 1605(a)(2).

17. PETROPAR's breach had a direct effect in the US because the Agreement required that most of the payment be made to the Designated Account in New York. In *Weltover,* the Supreme Court stated that there is a direct effect if it is an immediate consequence of the defendant's activity. 504 U.S. at 618. In *Weltover*, failure to pay at a New York account sufficed because "money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." Id. at 619.

18. The same conclusion applies here: PETROPAR failed to deliver payment to the New York Designated Account. This constituted the frustration of the designated performance,

not a remote financial consequence. The plaintiff's foreign character did not defeat jurisdiction in *Weltover*, nor can it defeat jurisdiction in the present case. Id.

19. Likewise, the Second Circuit held that failure to remit funds to New York accounts, as contractually required, had a "direct effect" in the United States. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994). Such rule was later reaffirmed in regards to foreign plaintiffs. *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC,* 813 F.3d 98, 111 (2d Cir. 2016). The Second Circuit further acknowledged that the United States has a substantial interest in maintaining New York as an international commercial center. *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521–22 (2d Cir. 1985). This is relevant to the "direct effect" analysis. While *Allied Bank* concerned an act-of-state Doctrine, TEXOS cites it since it confirms the legal significance the Second Circuit has attached to commitments made by foreign state-owned entities to make dollar payments in New York.

**D. The Payment Allocation Does Not Limit Jurisdiction to the New York Portion**

20. Clauses II-IV of the Settlement Agreement foresaw a single USD 6,898,750 payment obligation owed to TEXOS, who was the beneficiary of the sole and final settlement. Clause III directed a 42% contingency fee to Avalos's account at TEXOS's request, in its name and under its responsibility. Clause IV refers to TEXOS's acceptance of the full amount, and directs most of the payment to New York.[14] The Agreement provided that TEXOS would only be fully compensated upon receipt of the complete consideration.

[14] Ex. 1, cls. II-IV.

21. Payment to counsel represented a means of performance of PETROPAR's obligation. The fact that part of the payment was to be made outside the US does not require an independent domestic effect, nor does it limit jurisdiction to the New York amount.

22. The FSIA distinguishes the act that gives rise to the claim from the domestic effect that establishes jurisdiction. The FSIA requires that the sovereign's acts have a direct effect in the US, but it does not require that all claims be based on such an effect, nor that all plaintiffs experience it. *Atlantica*, 813 F.3d at 111–12, for example, sustained jurisdiction over the entire action, including foreign plaintiffs' claims. Similarly, in *Commercial Bank* payments directed at New York accounts owned by syndicate lead banks, who collected payment sufficed to fulfill the required effect, even though payment was not directed at the Kuwaiti plaintiff itself.

23. Similarly, *Fontana* sustained jurisdiction over an attorney's settlement proceeds claim since the settlement had ended litigation in New York. This demonstrated that a FSIA plaintiff need only show a direct effect on someone in the United States, plaintiff or not. 962 F.3d at 673 (quoting *Atlantica*, 813 F.3d at 111).

24. In the present case, failure to make payment in New York supplies the domestic effect of PETROPAR's nonperformance of the single payment obligation. The remaining payment does not require a separate jurisdictional effect.

***

25. Thus, the third clause of § 1605(a)(2) removes PETROPAR's immunity from suit in this action, and § 1330(a) supplies subject-matter jurisdiction over the entirety of TEXOS's damages claim.

**E. Personal Jurisdiction**

26. This Court has personal jurisdiction pursuant to § 1330(b). Such norm requires subject matter jurisdiction under § 1330(a) and service in accordance with § 1608. The FSIA requires no additional minimum-contact requirements, beyond those required by the immunity exceptions. *CC/Devas (Mauritius) Ltd. v. Antrix Corp.,* 605 U.S. 223, 232–33, 237 (2025). Thus, personal jurisdiction derives from the immunity exception, and proper service pursuant to the requirements in § 1608.

**IV. VENUE**

27. The SDNY is the proper venue under 28 U.S.C. § 1391(f)(1) because a substantial part of the relevant events giving rise to the claim occurred here. PETROPAR expressly agreed to pay most of the settlement consideration to the Designated Account in Manhattan and then failed to pay. Such omission is central to the breach and loss. See *Concesionaria DHM, S.A. v. International Finance Corp.*, 307 F. Supp. 2d 553, 560–61 (S.D.N.Y. 2004).

28. The "substantial part" inquiry is qualitative. Significant events material to the claim must bear a sufficiently close nexus to the forum. However, not all (nor most) events must take place there, and more than one district may qualify. *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408, 432–33 (2d Cir. 2005); *Gulf Insurance Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005). Even though the underlying litigation, settlement negotiations and payment decisions occurred in Paraguay, the agreed payment in New York was substantial and integral to performance. This is emphasized by the fact that the payment in New York was not incidental, it was expressly incorporated into the Agreement. The required standard is thus met.

## V. FACTUAL ALLEGATIONS

### A. The Underlying Dispute

29. In 2009, PETROPAR selected TEXOS's offer in a public tender to supply and deliver diesel to its facilities in Villa Elisa and Hernandarias, Paraguay. The contract was worth approximately USD 69.8 million.[15] On April 21, 2010, PETROPAR revoked the award and canceled the procurement through Resolution No. 244/10. The supply contract was never signed.[16] In December 2011, TEXOS initiated a civil action against PETROPAR before the Court of First Instance, seeking USD 31,357,956 for the failed transaction. The claimed compensation included lost profits, lost business opportunities, bid expenses and liability to suppliers.[17] The dispute remained pending for approximately nine years.

### B. The Settlement and Payment Terms

30. Negotiations began in 2020 and ultimately led to the execution of the Settlement Agreement on 2 December 2020. Sergio Guillermo Marsiletti signed as TEXOS's attorney-in-fact; Denis Lichi signed as PETROPAR's President; and Attorney General Sergio A. Coscia Nogués signed in his official capacity.[18]

31. The Settlement Agreement stated that its purpose was to resolve the pending damages claims.[19] TEXOS thus agreed to discontinue the approximately USD 31 million claim, in exchange for PETROPAR's payment of USD 6,898,750.[20]

---

[15] Ex. 1, recital I.
[16] Ex. 1, recital I.
[17] Ex. 1, recital I.
[18] Ex. 1, recital II.
[19] Ex. 1, cl. I.
[20] Ex. 1, recital III, cls. II, V.

32. Clause II required PETROPAR to pay USD 6,898,750 as sole and final settlement, free of all taxes, fees and duties.[21] Payment was subject to budget availability and the corresponding documentation.[22] The Agreement also specified how to pay: USD 2,897,475 would be paid to TEXOS's then-counsel at TEXOS's direction and in its name,[23] and USD 4,001,275 would be transferred to the Designated Account in New York. The Agreement identified the account number, ABA routing number, SWIFT code and branch information.[24]

33. The Designated Account was jointly held by Sergio Guillermo Marsiletti and Sergio Fabian Espeleta. The account was open and operational when the Agreement was signed and throughout the first quarter of 2021. The express payment instructions identified Citibank, N.A., International Personal Banking, 153 East 53rd Street, 4th Floor, New York, New York 10022.

34. There was a single USD 6,898,750 consideration. Clause IV calculated the New York payment as the balance after the amount directed to counsel was discounted.[25] The Agreement stated that TEXOS would only be compensated upon receipt of the full consideration. Thus, the execution of the Agreement alone did not satisfy its claims.[26]

**C. Judicial Approval**

35. The parties submitted the Agreement for judicial approval, pursuant to Clause V.[27] The Court of First Instance thus approved its terms in Interlocutory Order no. 2311, dated

---

[21] Ex. 1, cl. II.
[22] Ex. 1 at 11–12, cl. II.
[23] Ex. 1, cl. III.
[24] Ex. 1, cl. IV.
[25] Ex. 1, cl. IV.
[26] Ex. 1, cl. IV.
[27] Ex. 1, cl. V.

December 10, 2020 (the "December 10 Order").[28] The court found valid reciprocal concessions, and that the signatories had sufficient authority.[29]

36. Thus, the December 10 Order terminated the pending damages action, and the parties were left with a judicially approved promise of payment. The order also acknowledged that the parties would have no further claims concerning the proceedings in Paraguay once the Agreement was fully performed.[30]

**D. The Agreed Performance Periods**

37. Clause VI of the Agreement contemplated payment preferably during 2020, subject to budget availability. However, if payment was not completed during that period, the payment period would extend through the first quarter of 2021.[31] Thus, lack of budget availability in December 2020 did not eliminate the additional contractual period for performance.

**E. PETROPAR Sought Termination Before the Additional Period Began**

38. PETROPAR requested a budget increase from the Ministry of Finance on November 20, 2020.[32] Subsequently, it made no payment in December, and within weeks of signing the Agreement, it alleged inability to pay and requested judicial relief from the Agreement.[33]

---

[28] December 10 Order, Ex. 1 at 19.
[29] December 10 Order, Ex. 1 at 19.
[30] December 10 Order, Ex. 1 at 15.
[31] Ex. 1, cl. VI.
[32] PETROPAR, Resolución [Resolution] PR/DL No. 674/20, Dec. 28, 2020, at 1 (Para.).
[33] January 6 Order at 1.

39. On December 22, 2020, the TV program *La Caja Negra* made the Agreement public.[34] Press reports later addressed public criticism of the settlement and its signatories.[35]

40. On December 23, 2020, PETROPAR and the Attorney General asked the court to leave the agreement without effect, due to an alleged "impossibility of payment".[36] Thus, PETROPAR sought termination before the first-quarter of 2021 period even began.

41. Coscia was interviewed by Última Hora regarding the Agreement on December 23, 2020. He stated: "To avoid misinterpretations, I requested that the agreement be set aside." Moreover, in a publication dated December 24, 2020, La Nación quoted him stating: "but given the controversy that arose, we decided to cancel the contract." Both reports quoted him as continuing to uphold the settlement's merits. (Translations from Spanish.)[37] Based on those statements and the timing of the request for termination, TEXOS alleges, on information and belief, that the public controversy was the reason for PETROPAR and the Attorney General to seek termination.

42. On December 28, 2020, PETROPAR abrogated the resolution that authorized the budget increase and notified the Ministry of Finance that it would withdraw its request.[38] On

---

[34] Acuerdo antipatriota con sello de impunidad: Fiscalía cajoneó denuncia por transa entre PETROPAR y TEXOS OIL [Unpatriotic Agreement with a Seal of Impunity: Public Prosecutor's Office Shelved Complaint over Shady Deal Between PETROPAR and TEXOS OIL], La Caja Negra, 2021.

[35] Abdo ni Hacienda sabían de escandalosa "transa", reconoce Procurador [Attorney General Acknowledges That Neither Abdo nor the Ministry of Finance Knew of the Scandalous "Deal"], *Diario HOY*, Dec. 23, 2020.

[36] January 6 Order at 5.

[37] Cancelan pago de USD 7 millones tras salir a luz sospechoso acuerdo [USD 7 Million Payment Canceled After Suspicious Agreement Comes to Light], *Última Hora*, Dec. 23, 2020; Tras ser descubierto, procurador desmonta el acuerdo entreguista [After Being Exposed, the Attorney General Dismantles the Sellout Agreement], La Nación, Dec. 24, 2020.

[38] PETROPAR, Resolución PR/DL No. 674/20, arts. 1–2; Email from Paz Alarcón to the Ministry of Finance, Dec. 28, 2020 (transmitting Nota PR/DL No. 820/2020 and Resolución PR/DL No. 674/2020).

January 6, 2021, the Court of First Instance left the Agreement without effect per PETROPAR's petition, relying on Clause VI.[39]

43. On January 7, 2021, PETROPAR submitted Note PR/DL No. 013/21 to Paraguay's Anti-Corruption Secretariat. It was signed by its President, Mr. Lichi (the "January 7 Report"). It attributed the December 23 petition to fiscal-year closing deadlines, focusing mainly on the December 21 deadline for budget modification requests requiring an Executive decree.[40] These deadlines concerned 2020. The report did not explain why or how they could prevent performance during the first quarter of 2021, as contemplated by Clause VI.

44. On July 1, 2022, the appellate court found that the Agreement "was not complied with" and that the contractual period for payment expired.[41] It characterized Clause VI as an *express pacto comisorio* (i.e., an express contractual termination mechanism based on nonperformance of contractual obligations), under Article 726 of the Paraguayan Civil Code.[42] It also affirmed the termination of the Agreement for nonperformance.[43] The appellate court addressed the effects of an *express pacto comisorio*. It explained that, where an agreement contains such express mechanism, the parties may provide for contractual termination if an obligation is not performed in the agreed manner.[44]

45. TEXOS pursued a constitutional challenge. The Constitutional Chamber of the Supreme Court rejected it *in limine* in September 2025, due to defective proof of representation,

---

[39] January 6 Order at 4–5.
[40] PETROPAR, Nota PR/DL No. 013/21 to the Secretaría Nacional Anticorrupción [National Anti-Corruption Secretariat], Jan. 7, 2021, at 1, 3 (Para.).
[41] July 1 Appellate Order at 4.
[42] July 1 Appellate Order at 4-5.
[43] July 1 Appellate Order at 6.
[44] July 1 Appellate Order at 5.

and because the submission sought a review of the challenged decisions. It did not adjudicate the merits of TEXOS's present damages theory.[45]

**F. The Settlement Consideration Was Never Paid**

46. The Paraguayan court thus terminated the Agreement under Clause VI. However, this did not change the fact that PETROPAR undertook a USD 6,898,750 settlement obligation which it later failed to fulfill. The Designated Account received nothing.[46]

47. TEXOS does not ask that this court reinstate the Agreement, review the underlying litigation's merits or overturn the Paraguayan court's decision. It accepts the termination, and seeks damages for PETROPAR's failure to perform, and the resulting loss of the settlement.

**VI. GOVERNING LAW — PARAGUAYAN LAW**

48. Substantive contractual issues are governed by Paraguayan law. Actions brought under the FSIA involving nonfederal claims require that the Court apply the forum State's choice-of-law rules. The FSIA supplies no overriding federal conflicts rule. *Barkanic v. General Administration of Civil Aviation of the People's Republic of China,* 923 F.2d 957, 959–61 (2d Cir. 1991); *Cassirer v. Thyssen-Bornemisza Collection Foundation,* 596 U.S. 107, 115–17 (2022). New York choice of law principles point to Paraguay.

49. New York law asks whether an actual conflict exists. *GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.,* 449 F.3d 377, 382 (2d Cir. 2006). Here, material legal differences may affect PETROPAR's asserted excuses, as well as the scope of recovery. Paraguayan Civil Code Article 421 bases liability on willful misconduct or negligence,

---

[45] September 10 Order at 1–2 (Para.).
[46] Ex. 1, cls. II-V.

subject to the exonerating circumstances in Article 426. New York, in turn, does not require fault as a necessary element. *Harris v. Seward Park Hous. Corp.,* 79 A.D.3d 425, 426 (1st Dep't 2010). Article 425 of the Paraguayan Civil Code extends recovery to mediate consequences in case of malicious nonperformance, while New York requires consequential damages to have been foreseeable by the parties when contracting. *American List Corp. v. U.S. News & World Report, Inc.,* 75 N.Y.2d 38, 43 (1989).

50. To the extent an actual conflict requires a choice of law, New York's center of gravity or grouping of contacts analysis considers negotiation, performance, subject matter location and the parties' domiciles. *GlobalNet,* 449 F.3d at 383 (quoting *In re Allstate Insurance Co. (Stolarz),* 81 N.Y.2d 219, 227 (1993)). Even though TEXOS is Argentine, and payment was mainly due in New York, Paraguay has the predominant contacts. This is so since PETROPAR is a Paraguayan State entity, the Agreement was signed in Asunción, procedural obligations were to be performed in Paraguay, it settled litigation related to a Paraguayan procurement dispute, it was signed by the Paraguayan Attorney General, and it expressly referred to Paraguayan law.

51. Paraguayan law therefore governs the Agreement's interpretation, termination and legal effects; PETROPAR's nonperformance; and the availability and scope of damages. Thus, TEXOS gives notice under Federal Rule of Civil Procedure 44.1 that issues of Paraguayan law will arise.[47] The Applicability of Paraguayan Law does not affect this Court's FSIA subject matter jurisdiction under 28 U.S.C. §§ 1330(a) and 1605(a)(2).

[47] More specifically, relevant articles may include, without limitation, Articles 421, 423, 450, 452, 453, 475, 715, 725, and 726.

## VII. CAUSE OF ACTION — BREACH OF SETTLEMENT AGREEMENT

52. PETROPAR breached the Settlement Agreement and must compensate TEXOS for the resulting loss under Paraguayan law.

### A. PETROPAR Failed to Perform a Binding Settlement Obligation

53. The judicially approved Agreement created binding contractual obligations, which required PETROPAR to pay TEXOS USD 6,898,750.[48] Article 715 of the Paraguayan Civil Code provides that contracts are binding as law between the parties, and requires good faith performance of express contractual obligations, and their inherent consequences.[49] Paraguay's Supreme Court confirmed that Article 715 encompasses implicit contractual duties and that good faith operates with particular strength in contractual relations.[50]

54. Clause II of the Agreement fixed the consideration, and Clauses III and IV addressed payment.[51] TEXOS would be deemed compensated only once the total amount was received. PETROPAR made no payment whatsoever. Its nonperformance was expressly recorded by the Paraguayan appellate court when applying Clause VI.[52]

55. The fact that the Agreement contained budget-availability provisions did not make its performance discretionary. Clause VI anticipated that payment might not occur in 2020 and thus extended the period into the first quarter of 2021.[53] That was the contractually agreed effect of budget complications in 2020. PETROPAR still sought termination of

---

[48] Ex. 1, cls. II-V.

[49] Ley No. 1183/1985, Código Civil [Civil Code], art. 715 (Para.) (the "Paraguayan Civil Code").

[50] J.C.F.K. y otros c. L. Q. S.A. s. Indemnización de daño moral [Claim for Nonpecuniary Damages], Acuerdo y Sentencia [Judgment] No. 27, Corte Suprema de Justicia, Sala Civil y Comercial [Supreme Court of Justice, Civil and Commercial Chamber], June 26, 2023, Gaceta Judicial [Judicial Gazette] No. 3/2023, at 111 (Para.).

[51] Ex. 1, cls. II-IV.

[52] July 1 Appellate Order at 4.

[53] Ex. 1, cl. VI.

the Agreement in December 2020, and cited 2020 closing deadlines without explaining why it could not perform in the extended period. Reading the Agreement as permitting a discretionary refusal to pay would defeat its purpose and the good faith principle entirely.

**B. Termination Does Not Extinguish the Damages Claim**

56. TEXOS opposed termination of the Agreement and pursued constitutional review. For this claim, it accepts termination under Clause VI, characterized by the Appellate Court as an express *pacto comisorio* under Article 726.[54] TEXOS does not seek a reversal or review of the Paraguayan order.

57. Contractual termination and damages may coexist under Paraguayan law. Article 726 pertains to termination for failure to perform a contract, and the consequences of nonperformance. The law does not convert that nonperformance into compliance, nor does it erase the conduct that resulted in termination. There may thus be liability for the resulting loss.

58. Clause VI permits the parties to pursue "the corresponding legal actions" following nonperformance and refers to continuation of the underlying proceedings "as the case may be." TEXOS submits that this language preserves the remedies available under Paraguayan law and does not make continuation of the underlying lawsuit the exclusive remedy.[55] Articles 708 and 709 of the Civil Code require reading the Agreement as a whole. Naturally, Clauses IV and VIII condition TEXOS's full satisfaction to actual performance, and payment of the full amount. Thus, the Settlement Agreement does not support the idea that either party could simply frustrate performance and thereby obtain a

[54] July 1 Appellate Order at 5.
[55] Ex. 1 at 13, cl. VI.

release from liability. This interpretation is also consistent with the good faith principles contained in Articles 712, 714 and 715 of the Civil Code.

59. Article 421 of the Civil Code bars advance liability waivers for an obligor's willful misconduct (*dolo*). TEXOS does not allege that termination itself establishes such *dolo.* However, to the extent that PETROPAR's conduct is ultimately found to have been intentional, Article 421 precludes construing Clause VI as a release from liability.

60. Article 725 provides that resolution of bilateral contracts may lead to damages and interest. In *Dyalco S.A. c. Municipalidad de Asunción s. Rescisión de Contrato,* an appellate court applied an express termination clause and acknowledged that the non-breaching party may seek both termination and compensation for the damage caused by the breach of contract.[56]

61. Moreover, *Dyalco* addressed resolution and damage separately. It distinguished losses incurred during suspension from those caused by termination, and attributed the latter to the breaching party responsible for termination. Importantly, it acknowledged that such termination may lead to actual loss and lost profit damages. *Dyalco*, Gaceta Judicial No. 2/2011, at 326. This decision is thus fundamental, as it confirms that termination due to nonperformance does not extinguish damages claims, as long as harm is proven.

62. In the present case, Paraguayan rulings determined the Agreement's status after nonperformance, and provided it had been terminated. However, they did not adjudicate TEXOS's present claim for compensation for the resulting loss.

[56] *Dyalco S.A. c. Municipalidad de Asunción s. Rescisión de contrato* [Claim for Contract Termination], Acuerdo y Sentencia No. 7, Tribunal de Apelación en lo Civil y Comercial, Tercera Sala [Court of Appeals in Civil and Commercial Matters, Third Chamber], Feb. 14, 2011, Gaceta Judicial No. 2/2011, at 315–16 (Para.).

**C. The Elements of Contractual Liability Are Satisfied**

63. The fact that the Agreement was terminated is distinct from liability for nonperformance. Paraguay's ordinary contractual liability rules govern recovery. In this sense, Article 421 imposes liability for losses caused by the debtor's willful misconduct or negligence while performing an obligation. Article 423 states that the debtor is responsible for damages caused by its delay in performing an obligation. Article 450, on its part, defines recoverable contractual damages as including both "the value of the loss suffered" and "the value of the profits foregone". Finally, under Article 452, courts may fix compensation once loss is established, even if the precise amount is indeterminate.

64. Paraguayan scholarship distinguishes primary contractual obligations from the secondary obligation to repair damages caused by breach. Moreno Rodríguez Alcalá described contractual liability as a claim to repair damages related to breaches, within the legally available remedies protecting creditors' rights. *13 Hipótesis (en paños menores) para Construir un Sistema de Remedios Contractuales en Nuestro Derecho* [Thirteen Hypotheses for Building a System of Contractual Remedies in Our Legal System], at 208–09. Martínez Simón similarly explained that total, partial or delayed nonperformance may lead to civil liability. *Alberto Joaquín Martínez Simón, La culpa y el dolo en la responsabilidad civil contractual y en la extracontractual* [Fault and Dolo in Contractual and Noncontractual Civil Liability], Revista de la Facultad de Derecho y Ciencias Sociales (UNA) 153, 156 (2017).

65. Civil liability requires the presence of four cumulative elements: unlawfulness (*antijuridicidad*), a legal basis for imposing liability (*factor de atribución*), damage, and causation. *J.C.F.K.*, Gaceta Judicial No. 3/2023, at 110.

66. First, unlawfulness, in contract law, consists of nonperformance. It is met if the debtor fails to comply with the performance it owed, whether through absolute nonperformance or inaccurate performance. *Id.* at 110. PETROPAR failed to make the promised payment.[57]

67. Second, nonperformance of an obligation suffices as a legal basis for imposing liability. Once nonperformance and loss are alleged, the debtor can only liberate itself from contractual liability by invoking and proving the existence of an appropriate exonerating circumstance. *J.C.F.K.*, Gaceta Judicial No. 3/2023, at 110, 112–13. Such exonerating circumstances are limited. Article 426 addresses the *caso fortuito* or *fuerza mayor* (i.e., *force majeure*). However, it does not excuse events that result from the debtor's own fault, or occurring after default.

68. In the present case, PETROPAR asserted budgetary difficulty. That assertion must be assessed against Clause VI's extended performance period.[58] Its January 7 Report relied on 2020 closing deadlines without explaining why they prevented performance in that later period in time. Yet, PETROPAR and Attorney General Coscia sought termination of the entire Agreement before the additional period even began.

69. TEXOS alleges that PETROPAR's nonperformance was attributable to its failure to exercise the diligence required by the nature of its contractual obligation under Article 421. This is reflected in PETROPAR's conduct before the January 6 Order, including withdrawing the budget increase request and seeking termination in 2020, before the additional compliance period even began.

---

[57] July 1 Appellate Order at 4.

[58] Ex. 1, cl. VI.

70. Article 722 separately addresses the situation in which performance becomes impossible due to the obligor's conduct. It allows the other party to either perform and claim damages and interest, or to terminate the contract and recover those damages. Thus, if PETROPAR's own culpable handling of the budgetary process made payment impossible, Article 722 expressly preserves TEXOS's damages remedy.

71. Third, TEXOS suffered a concrete loss: the loss of the settlement bargain. TEXOS relinquished the prosecution of a claim exceeding USD 31 million in exchange for a judicially approved consideration of USD 6,898,750. PETROPAR failed to pay, and the Agreement was terminated. The agreed consideration constitutes relevant evidence of the value of that bargain.

72. Fourth, the loss suffered by TEXOS was a direct consequence of nonperformance. Paraguay's Supreme Court applies the adequate causation standard, asking whether the conduct produces the invoked loss in "the ordinary and natural course of events". *J.C.F.K.*, Gaceta Judicial No. 3/2023, at 118. Absent PETROPAR's nonperformance, the Settlement Agreement would have been performed and TEXOS would have received the agreed settlement consideration. Instead, PETROPAR's failure to comply with the agreement therefore provides the direct causal link between the contractual undertaking, the resulting termination, and TEXOS's economic loss.

**D. TEXOS Is Entitled to the Economic Value of the Lost Settlement**

73. The measure of damages suffered by TEXOS is distinct from the termination of the Settlement Agreement. *Dyalco* makes this precise distinction, by separately considering the contractual basis for termination and the damages claimed. *Dyalco*, Gaceta Judicial No. 2/2011, at 315–16, 326. In this context, the appropriate counterfactual scenario is

straightforward. Had PETROPAR performed, TEXOS would have obtained USD 6,898,750 and ended the underlying litigation. Instead, it received nothing, the Settlement Agreement was terminated due to PETROPAR's noncompliance, and TEXOS was returned to the pre-settlement litigation.

74. The agreed settlement amount is contemporaneous evidence of the lost benefit. The agreed consideration is thus highly probative evidence of the economic benefit that TEXOS lost when PETROPAR failed to perform the Settlement Agreement.

75. Paraguayan law recognizes the principle of full reparation, which seeks to place the creditor in the position it would have occupied absent nonperformance.[59] Article 450 encompasses the loss suffered and profits foregone as a consequence of delay or nonperformance. Article 452 authorizes the court to determine compensation when the existence of loss has been established but its precise amount cannot be determined.[60]

76. In cases of culpable nonperformance, Article 450 allows recovery of direct or immediate consequences. For intentional nonperformance, however, Article 425 may extend liability to mediate consequences. *G.M.V. c. L.M.R.B. s. Indemnización de daños y perjuicios* [Claim for Damages], Acuerdo y Sentencia No. 1184, Corte Suprema de Justicia, Sala Civil y Comercial, Sept. 19, 2013, Gaceta Judicial No. 1/2014, at 141 (Para.).

77. TEXOS is hereby claiming the immediate and direct consequence of PETROPAR's nonperformance of the Agreement, a judicially approved settlement. The Agreement

---

[59] *Julio Nelson Brizuela c/ Rápido Yguazú S.A. (RYSA) s/ Indemnización de daños y perjuicios* [Claim for Damages], Acuerdo y Sentencia No. 1547, Corte Suprema de Justicia, Sala Civil y Comercial, Nov. 19, 2013, Gaceta Judicial No. 2/2017, at 69 (Para.).

[60] *Olegario Farrés y otra c/ Bancoplus S.A.I.F. s/ Indemnización de daños y perjuicios* [Claim for Damages], Acuerdo y Sentencia No. 1580, Corte Suprema de Justicia, Sala Civil y Comercial, Dec. 27, 2002, reproduced in Corte Suprema de Justicia, Responsabilidad civil: Daños y perjuicios [Civil Liability: Damages] 234, 236–39 (2008) (Para.).

exchanged uncertain, prolonged litigation for payment. *Dyalco* attributes loss related to termination to the party whose breach caused termination. TEXOS measures its economic loss by reference to the agreed USD 6,898,750. This does not mean that the present action is seeking specific performance of the terminated agreement.

78. The restoration of TEXOS's underlying Paraguayan lawsuit did not place TEXOS in the economic position it would have enjoyed had PETROPAR actually performed the Agreement. It restored an uncertain cause of action but did not provide TEXOS with the USD 6,898,750 settlement consideration that PETROPAR had undertaken to pay.

**E. Interest and Other Monetary Relief**

79. TEXOS seeks damages established at trial, measured at no less than USD 6,898,750, together with the prejudgment interest recoverable under Paraguayan law, post-judgment interest pursuant to 28 U.S.C. § 1961, costs, and any other relief the Court deems appropriate.

80. Article 423 provides that the debtor is responsible for delayed performance, and Article 475 provides for interest for default, without requiring separate proof of additional harm. TEXOS thus seeks prejudgment interest on the recoverable amount, measured from the applicable accrual date, through the date of judgment. The precise amount of the appropriate prejudgment interest will depend on the applicable Paraguayan interest rules, including any applicable limitations prescribed by Article 475 and relevant regulations and publications of the Central Bank of Paraguay. The applicable rate and accrual date will be determined by the Court under Paraguayan law pursuant to Federal Rule of Civil Procedure 44.1, and the accrued interest will be calculated accordingly.

81. Accordingly, PETROPAR's nonperformance of the Settlement Agreement and the resulting loss suffered by TEXOS give rise to contractual damages pursuant to extant Paraguayan law.

**VIII. PRAYER FOR RELIEF**

WHEREFORE, TEXOS respectfully requests judgment against PETROPAR awarding:

1. Compensatory damages in an amount to be determined at trial, but no less than USD 6,898,750;
2. Prejudgment interest from the applicable accrual date through entry of judgment, as permitted under the applicable Paraguayan law;
3. Postjudgment interest in accordance with 28 U.S.C. § 1961;
4. Costs of this action; and
5. Such other and further relief as the Court deems just and proper.

11/02/2026
Date

S/ Francisco Calvo

Francisco Calvo
New York Attorney Registration No.: 5990619
Jarsun Ferreira & Calvo
Juncal 615, 13C, C1062
Ciudad de Buenos Aires, Argentina
Telephone: +54 11 2396 6773
Email: fcalvo@JFCattorneys.com
Attorney for Plaintiff TEXOS S.R.L.